# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

Preferred Financial Services, Inc., )
                                  )
       Plaintiff, )
                                    )    C.A. No.: N16J-05369 SKR
      v. )
                                    )
A&R Bail Bonds LLC and )
Rodney Burns, )
                                    )
       Defendants. )

Submitted: October 25, 2018
Decided: January 23, 2019

*Upon Preferred Financial Services, Inc.'s Appeal from the Commissioner's Proposed Findings of Fact and Recommendations*: **DENIED**.

Sean T. O'Kelly, Esq., O'Kelly Ernst & Joyce, LLC, Wilmington, Delaware, Attorney for Plaintiff.

Brian T.N. Jordan, Esq., Jordan Law LLC, Wilmington, Delaware, Attorney for Defendants.

**Rennie, J.**

## OPINION

This case arises out of a purported business loan agreement between Preferred Financial Services, Inc. ("PFS") and A&R Bail Bonds LLC ("A&R"), which includes a confession of judgment provision. PFS seeks to confess judgment against Defendants, A&R and its managing member, Rodney Burns ("Burns"). A Superior

Court Commissioner found that the parties' business dealings under the loan agreement violate 18 *Del. C.* § 4333(d), and the agreement is thus void and unenforceable. Now before the Court is PFS's appeal of the Commissioner's decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 20, 2014, PFS, as lender, and A&R, as borrower, entered into a Business Loan Agreement (the "Agreement") and a Note,[1] recording a revolving line of credit with a principal amount of $100,000 and an interest rate of 5.5% per annum.[2] Burns, in addition to signing the Note on behalf of A&R, also executed it as "Guarantor."[3] The Agreement provides that the loan proceeds were to be used "solely to post property bails (as such term is defined by 18 *Del. C.* § 4332, as amended or replaced from time to time) for Borrower's customers."[4] A&R was a licensed Delaware bail bonds company, and the purpose of the loan was to facilitate PFS's advancement of funds to A&R to enable it to meet its business obligations in posting cash bails.

The Agreement also provides that, in order to compensate PFS for the costs and expenses it incurred in connection with the loan, PFS was to collect an

---

[1] The parties stipulated to the genuineness of the Agreement and Note. The Agreement and Note were offered as joint exhibits for the Court's consideration (Trans. ID. 59448893), and will hereinafter be referred to as "Agreement at ____" and "Note at _____," respectively.

[2] Note at 1, paragraphs 1, 3.

[3] *Id.* at 2.

[4] Agreement at 3, paragraph 5(i).

2

"origination fee" of 13% of each "Advance" and "prepaid interest" of 2% of each "Advance," plus an annual fee of $300.[5] An "Advance" is defined as "a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement."[6] The Note contains an explicit Confession of Judgment Provision.[7]

On June 23, 2016, PFS initiated this action by filing a Notice of Entry of Judgment,[8] pursuant to Superior Court Civil Rule 58.1, seeking to confess judgment against both A&R and Burns based on the Note. The filing is supported by an Affidavit of Amount Due, seeking to recover $124,657 in principal, plus interest, attorneys' fees and court costs.[9] On August 29, 2016, an Order was entered for PFS by default due to Defendants' failure to appear.[10] Defendants subsequently moved to vacate the judgment, contending that they were not properly served.[11] On January 25, 2017, the Court granted Defendants' Motion to Vacate.[12] This matter was thereafter set for an evidentiary hearing that began on June 29, 2017,[13] and after a brief recess, concluded on August 3, 2017.[14] Burns, and PFS's president, Edwin

---

[5] *Id.* at 5, paragraph 11.
[6] *Id.* at 6, paragraph 14(a).
[7] Note at 1, paragraph 10.
[8] Notice of Entry of Judgment (Trans. ID. 59184191).
[9] Affidavit of Amount Due (Trans. ID. 59184191).
[10] Order Granting PFS's Confessed Judgment (Trans. ID. 59448290).
[11] Motion to Vacate (Trans. ID. 59674348).
[12] Order Granting Defendants' Motion to Vacate (Trans. ID. 60116813).
[13] Transcript of June 29, 2017 Hearing ("June Trans.") (Trans. ID. 60871118).
[14] Transcript of August 3, 2017 Hearing ("Aug. Trans.") (Trans. ID. 61384429).

Swan ("Swan"), were the only two witnesses that testified at the hearing, and their testimonies, while consistent on some issues, were in conflict on many other key issues.

Swan testified that PFS "provides loans and funding for commercial enterprises," including bail bonds companies.[15] PFS had been doing business with and funding bails for A&R since 2011.[16] Before February 2014, the parties' relationship was more of a "handshake" nature.[17] On February 20, 2014, the parties entered into the Agreement to document their business dealings. Swan testified that the Note and Agreement evidenced a line of credit that intended to consolidate old debts, bring arrears up to date, and start anew.[18] Swan presented a spreadsheet outlining all the advancements that he claimed were unpaid by A&R under the Agreement.[19]

There is no dispute that the parties' business dealings under the Agreement would generally proceed as follows: Burns would approach Swan and request an Advance to post a cash bail for a criminal defendant.[20] Depending on the amount,

---

[15] June Trans. at 27.

[16] *Id.* Prior to November 2012, Swan's business affairs with A&R were operated under the name of a different entity. *Id.*

[17] *Id.* at 32.

[18] *Id.* at 34–35.

[19] The spreadsheet is the only document produced by PFS that sets forth the alleged debts owed by A&R and Burns. No receipts, bank statements, or any other evidence was presented.

[20] June Trans. at 61; Aug. Trans. at 36.

Swan would almost always approve the Advance.[21] The fund would either be transferred to A&R through a bank account, or if the amount was small, it would be hand delivered to Burns.[22] Burns would then go to the court, post the bail, and return a copy of the documentation to PFS for its records.[23] PFS monitored all cases and kept track of the status of the bonds.[24] Once a case was resolved, PFS would notify Burns, and Burns would pick up the check from the court and return it to PFS.[25]

PFS charged a percentage on every Advance it forwarded to A&R. When asked how much PFS charged A&R for each bail, Swan referred to the Agreement and testified that PFS charged 15% on each bail, which includes a 13% origination fee and 2% prepaid interest.[26] Burns confirmed this 15% fee.[27] Burns also testified that 2% of the bail that he paid to PFS would go to a "build up fund" account ("BUF") that he would retain at the end of the relationship.[28] A BUF account is usually created in the secured bail bonds industry where insurance companies are involved.[29] It is a reserve fund where a portion of each bail is set aside to pay any

---

[21] June Trans. at 61–62.

[22] *Id.* at 64–65; Aug. Trans. at 36–37.

[23] June Trans. at 65–66; Aug. Trans. at 37–38.

[24] June Trans. at 66.

[25] *Id.*; Aug. Trans. at 38.

[26] Aug. Trans. at 15.

[27] *Id.* at 43. Burns testified that he normally charged a criminal defendant (or his family) 30% of the bail amount to be posted, and the parties split the premium at 15% each. *Id.* at 44. Burns also testified that A&R would sometimes pay PFS 18%, but did not explain when or why. *Id.* at 43.

[28] *Id.*

[29] *Id.* at 16.

forfeitures when a criminal defendant absconds.[30] Burns further testified that the parties shared the responsibility 50/50 for any forfeitures in the event that a defendant absconded.[31] Swan denied that they agreed to any arrangements on a BUF account.[32] Swan also denied that there was any forfeiture sharing between PFS and A&R, and testified that A&R bore 100% of the loss of any forfeitures.[33]

The parties' positions also diverge when it comes to who initiated the bails. Burns testified that Swan sometimes initiated bails and at times would ask Burns to post them for him.[34] In those situations, Burns testified that he acted solely as an intermediary, never met the defendant, and received no paperwork or payment from the family.[35] Swan denied that PFS solicited bail business from the public or initiated any bails in its relationship with A&R.[36]

Burns testified that, based on the way PFS and A&R did business, the relationship between the parties was more of a "partner" than a "funder."[37] Burns also testified that the bail posting arrangements between PFS and A&R remained the same both before and after they entered into the Agreement.[38] Further, Burns

---

[30] *Id.*
[31] *Id.* at 46–47.
[32] *Id.* at 17.
[33] June Trans. at 45; Aug. Trans. at 94–95.
[34] Aug. Trans. at 50–52.
[35] *Id.*
[36] *Id.* at 93–94.
[37] *Id.* at 39.
[38] *Id.* at 40.

testified that because the Department of Insurance issued new regulations in 2014, requiring that only licensed bail bonds agents could post cash bails, Swan asked him to sign the Agreement in order to get around the new rules.[39] In other words, Burns alleged that he and Swan "conspired to violate the insurance laws of the State of Delaware," and that the Note and Agreement are therefore illegal and unenforceable.[40] Swan denied any alleged "conspiracy" to violate the insurance laws.[41] Swan contended that the Agreement was intended to bring the parties' relationship into "compliance" with the new regulations.[42]

On January 26, 2018, the Commissioner issued an Order in this matter.[43] The Commissioner initially found that the Confession of Judgment Provision in the Note is valid, and that A&R knowingly, intelligently, and voluntarily waived notice and hearing by signing the Note.[44] The Commissioner also found that, to the extent PFS sought to recover debts owed to Swan (and/or his wife) personally, or that were advanced to A&R for reasons other than posting cash bails, those debts cannot be recovered against A&R or Burns in this Confession of Judgment action.[45] The

---

[39] *Id.* at 41.
[40] *Id.* at 57.
[41] *Id.* at 93.
[42] *Id.*
[43] January 26, 2018 Order (Trans. ID. 61614901). Under Superior Court Civil Rule 132(a)(4), it is more appropriate to entitle the January 26 Order as "Proposed Findings of Fact and Recommendations," because it was rendered in a case-dispositive matter.
[44] *Id.* at 11–12.
[45] *Id.* at 12.

7

Commissioner further found that there was not sufficient evidence showing that Burns intended to be bound personally on the Note and Agreement, thus the judgment cannot be confessed against him personally.[46]

With regard to the parties' business dealings under the Agreement, the Commissioner found that neither witness was entirely credible, but concluded that Burns' version of the parties' business transactions is more consistent with the terms of the Note and Agreement.[47] The Commissioner decided that, under the doctrine of *in pari delicto*, since the parties entered into the Agreement solely to circumvent the insurance laws, she would not enter any judgment in this matter and would leave the parties where the Court found them.

On February 9, 2018, PFS filed Objections to the Commissioner's Order,[48] to which Defendants responded on February 23, 2018.[49] On October 25, 2018, the Court conducted oral argument on the Objections.[50] After considering the written submissions and oral argument, and the record in this case, the Court agrees with the Commissioner's conclusion, and accordingly declines to enter a judgment in this matter.

---

[46] *Id.* at 13–14.

[47] *Id.* at 4, 10.

[48] Appeal from the Commissioner's Findings of Fact of Recommendations (Trans. ID. 61675235).

[49] Defendants' Response to Plaintiff's Appeal from the Commissioner's Findings of Fact of Recommendations (Trans. ID. 61724636).

[50] October 25, 2018 Transcript (Trans. ID. 62763585).

8

## II. STANDARD OF REVIEW

Superior Court Civil Rule 132 provides that the Court shall make a *de novo* determination of those portions of a Commissioner's proposed findings of fact and recommendations, rendered in a case-dispositive matter, to which an objection is made.[51]

If a confession of judgment action is contested, courts are to inquire into the validity of the waiver. The plaintiff bears the burden of proving that the defendant has knowingly, intelligently, and voluntarily waived notice and an opportunity to be heard.[52] If the plaintiff carries his burden, the burden shifts to the defendant to raise defenses to prevent an entry of judgment.[53]

## III. LEGAL ANALYSIS

Since the issue of illegality, by itself, determines the outcome of this case, the Court's analysis will be focused solely on that issue. Before discussing the merits of the illegality issue, the Court will address two preliminary matters raised by PFS. First, PFS contends that the Court should not even consider Defendants' illegality defense. PFS relies on statutory language that allows a defendant, after being found to have waived his right to notice and a hearing, to present defenses "of which he had no knowledge at the time he signed the instrument" containing the confession

---

[51] Super. Ct. Civ. R. 132(a)(4)(iv).
[52] Super. Ct. Civ. R. 58.1(d)(5).
[53] Super. Ct. Civ. R. 58.1(h)(3)(III).

9

of judgment clause, "or which arose subsequent to the signing of such instrument."[54] PFS contends that Burns clearly "knew" of the illegality defense before signing the Note and Agreement. Indeed, Burns testified that the parties entered into the Agreement solely to circumvent the insurance laws, and thus, PFS contends, Burns cannot now be allowed to assert that defense.

This argument is misplaced. The Commissioner refused to enter any judgment in this case based on the doctrine of *in pari delicto*, which is a general rule that courts "will not extend aid to either of the parties to a criminal act or listen to their complaints against each other but will leave them where their own act has placed them."[55] Under this doctrine, a party is barred from recovering losses "substantially caused by activities the law forbade him to engage in."[56] In other words, courts will not extend relief to any party who is a "substantial participant" in a wrongful scheme or "provid[e] an accounting between wrongdoers."[57] There is no authority suggesting that a confessed judgment action is exempted from this general rule. If the Court finds that PFS and A&R are equally at fault by entering into the Agreement and *in pari delicto* applies, PFS simply cannot recover what it seeks from

---

[54] 10 *Del. C.* § 2306(j); *Cheidem Corp. v. Farmer*, 449 A.2d 1061, 1064 (Del. Super. 1982).

[55] *In re Am. Int'l Grp., Consol. Derivative Litig.*, 976 A.2d 872, 882 (Del. Ch. 2009) (internal citation omitted). There are exceptions to this general rule that are not applicable in this case. *See id.* at 883.

[56] *Id.* (internal citations omitted).

[57] *Id.* at 882–83 (internal citations omitted).

10

this action, despite any potential limitations on the defenses that A&R is allowed to raise.

Second, PFS contends that, in determining whether the Agreement and Note are illegal, the Court is limited to the four corners of the documents, and cannot consider improper parol evidence such as Burns' oral testimony on how the parties conducted business under the Agreement. This argument also does not have merit. "When a written contract is intended to be the final expression of the parties' agreement, the parol evidence rule bars introduction of evidence of prior or contemporaneous oral understandings that vary the written terms of the agreement."[58] Here, in addition to the terms of the Agreement and Note, the Commissioner also considered and based her ruling on oral testimonies of both Swan and Burns regarding how they conducted their business under the Agreement and Note. Those transactions are not "prior or contemporaneous" oral agreements that "vary" the written terms of the Agreement. Rather, they evidence a course of conduct that transpired after the Agreement was signed and demonstrate how the parties performed under the Agreement. Thus, the oral testimony relied upon by the Commissioner is not improper parol evidence, and the Court is free to consider it.

---

[58] *Oglesby v. Conover*, 2011 WL 3568276, at *2 (Del. Super. May 16, 2011) (internal citation omitted).

11

Now the Court turns to the merits of Defendants' illegality argument. Defendants contend that the Agreement, entered into in order to get around the requirements prescribed in 18 *Del. C.* § 4333, violates that statute, and is therefore unenforceable. Section 4333 of Title 18 of the Delaware Code, enacted in January 2014, requires that any person[59] that maintains a "10% or greater financial interest" in a bail agent's business or any bail bonds must be licensed as a bail agent.[60] The question then boils down to whether the business arrangement under the Agreement made PFS acquire a 10% or greater financial interest in one or more of the bail bonds that had been posted. The Court agrees with the Commissioner and finds that the answer is yes.

There is no dispute that PFS is not a licensed bail agent in Delaware. Swan characterized PFS's relationship with A&R as a pure lending relationship under which PFS purported to lend funds to A&R to post cash bails, and in exchange, was paid 15% of the amount of each cash bail. PFS denies that it has any part in A&R's bail bonds business and contends that it therefore cannot maintain any financial interest in those bonds. PFS's contention is belied by Swan's own description of the relationship. Swan testified that Burns would approach him with an Advance request, obtain the Advance, and post the bail in the court. Thereafter, Burns would

---

[59] The statute defines "person" to mean either an individual or a business entity. 18 *Del. C.* § 4332(10).
[60] 18 *Del. C.* § 4333(d).

give the paperwork to Swan, and Swan would track the case, and after it was resolved, notify Burns that the bond was ready to be collected. Burns would then go to the court, collect the bond, and return it to Swan. In a typical lending relationship, the lender does not lay claim to the funds after they were loaned and disbursed. A typical lender claims an interest in the accumulating debt as a whole, and usually will require a minimum monthly payment obligation or some other payment arrangements to pay down the debt as a whole. This is not the case here. In this case, it is clear that PFS was closely involved in the posting of bails. Moreover, PFS did not lay claim to the advanced funds as a whole, but rather, required that each bail be "returned" to PFS once released by the court.[61] PFS's interest in the funds thus converted from "cash" to the "bonds."

Therefore, the Court finds that PFS retained a financial interest in each Advance or cash bail posted by A&R. Since PFS required that the entire bail be returned to it, the Court finds that PFS actually retained a 100% financial interest in those bail bonds, a clear violation of § 4333(d).[62] PFS argues that the Agreement

---

[61] The term "return" is used in both Swan's testimony and the spreadsheet that outlines the unpaid Advances between the parties.

[62] The Court also finds that the parties acted as partners with regard to posting of bails, rather than a lender and a borrower as purported by the Agreement. The Commissioner found that it is more likely than not that the purpose of the 2% prepaid interest was intended to fund a BUF account, and that the parties shared forfeiture liability. The Court finds that there is not enough in the record to support that finding, as the only evidence concerning that finding, testimonies from Swan and Burns, are in direct conflict. The Court, however, finds it unnecessary to make such a finding. The undisputed evidence on the record has shown that PFS maintained more than 10% of financial interest in bail bonds posted by A&R.

13

cannot be found illegal from the four corners of the document, because it is a lending contract without any indication of violation of the law on its face. However, a finding of illegality of a contract can be based solely on the parties' conduct under the contract, and is not curable by its fictitious form.[63] Here, the parties' course of conduct under the Agreement violates the statute. It does not matter that the Agreement may on its face appear to be legal.

Finding that the Agreement directly violates 18 *Del. C.* § 4333, the next question is whether it is otherwise enforceable. "Contracts may be unenforceable if they are either illegal *per se* or violate public policy."[64] As discussed above, the Agreement is illegal *per se* because it violates the explicit mandate of a statutory provision. To determine whether a contract should be unenforceable as a matter of public policy, the Court considers the following factors:

> the statute's language, nature, object, purpose, subject matter, reach, the wrong or evil which the law seeks to remedy or prevent, the class of persons sought to be controlled, the legislative history and the effects of holding a contract in violation of the law invalid as well as balancing the interest in enforcement of the contract against the law's underlying public policy.[65]

---

[63] *Della Corp. v. Diamond*, 210 A.2d 847, 849 (Del. 1965) (finding agreement allowing unlicensed plaintiff to purchase and sell alcoholic beverages illegal and unenforceable, even if in the guise of a fictitious managerial contract).

[64] *Bunting v. Citizens Fin. Grp.*, 2007 WL 2122137, at *5 (Del. Super. June 29, 2007) (internal citations omitted).

[65] *Id.*

14

Title 18, Section 4333 is part of a broader revision to the bail bond statutes that were enacted with the specific intent of curbing abuses in the bail bond system.[66] Specifically, § 4333(d), the section at issue in this case, was enacted to "restrict participation by unlicensed persons in the bail bond business."[67] It not only requires that a licensed bail agent disclose to the regulating authority the identity of persons who maintain a 10% or more interest in the agent's business or any bail bonds, but also requires that all such persons must themselves be licensed bail agents.[68] Thus, both PFS/Swan and A&R/ Burns are within the class of persons sought to be controlled under the statute. The way the parties acted under the Agreement demonstrates PFS's *de facto* participation in the posting of bails. PFS acting as a bail agent without the required licensure is the very "wrong or evil" the statute seeks to prevent.

PFS argues that the Agreement is akin to the agreement in *Bunting v. Citizens Financial Group*, and should not be voided on public policy grounds. The Court disagrees. In *Bunting*, the plaintiff was an employee of the defendant bank, and was tasked with notarizing documents, including mortgages.[69] The plaintiff, consistent with the defendant's normal notary practice, notarized a mortgage without

---

[66] *See* Synopsis, H.B. 151, 147th Gen. Assemb. (Del. 2013).
[67] *Id.*
[68] 18 *Del. C.* § 4333(d).
[69] *Bunting*, at *1.

personally witnessing the signature before her.[70] This violated the defendant's written policy, and the plaintiff was terminated for this conduct.[71] The plaintiff contended that she and the defendant had an implied contract that allowed her to notarize documents signed outside of her presence, which was a practice regularly engaged in by the defendant's employees in the workplace.[72] The defendant argued that even if such a contract existed, it is unenforceable because it is illegal.[73] The Court found that what the parties had been doing was not explicitly prohibited by notary law, and was not against public policy.[74] The Court acknowledged that the purpose of the notary law is to provide a way for signatures to be authenticated, but found that the actual notary practice engaged in by the parties did not evade this requirement.[75] Both parties believed in good faith that in all cases the customer had actually signed the document, because other employees of the defendant who presented the document to the customer had witnessed the signature.[76] In addition, the Court found that the customer's interest had not be damaged because the legislature determined that defectively acknowledged documents will not be invalidated when, as was the case in *Bunting*, the notarization is merely a technical

---

[70] *Id.*
[71] *Id.*
[72] *Id.* at *4.
[73] *Id.* at *5.
[74] *Id.*
[75] *Id.*
[76] *Id.*

16

requirement.[77] Therefore, the Court concluded that the contract substantially complied with the notary law and voiding it was not necessary to protect public interest.[78]

This case is different. What is involved here is not merely a technical defect. The new bail bonds regulation was enacted in January 2014, and the Note and Agreement were entered into in February 2014. Although Swan alleged that the Agreement was intended to bring the relationship between PFS and A&R into compliance with the new law, the way they conducted business under the Agreement is virtually identical to their practices before the statute changed. Based on the record before the Court, it is abundantly clear that the parties entered into the Agreement solely to circumvent the law and allow PFS to use A&R's bail license to do indirectly what it was not permitted to do directly. By enacting the 2014 statute, the legislature sought to tighten regulatory oversight of the bail bonds industry, and prevent unlicensed persons from engaging in the bail bonds business. However, the parties, under the guise of the Agreement, worked in concert to manipulate the statute's prohibitions. The Agreement is against the very public policy the statute seeks to protect.

---

[77] Id.

[78] Id. at *6.

For the foregoing reasons, the Court **ADOPTS** the Commissioner's ruling that the Agreement is illegal and unenforceable, and will apply the doctrine of *in pari delicto* to leave the parties where the Court finds them.[79]

PFS's Appeal from the Commissioner's Proposed Findings of Fact and Recommendations is hereby **DENIED**.

**IT IS SO ORDERED.**

Sheldon K. Rennie, Judge

---

[79] PFS also filed objections to the Commissioner's other factual findings and legal conclusions. Since the Court has based its ruling in this case on the ground of illegality, those objections are now moot.